UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| SANTOKH SOHAL, on Behalf of Itself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>ELLIS YAN, *et al.*,<br><br>Defendants. | No. 1:15-cv-00393-DAP<br><br>CLASS ACTION<br><br>**JURY DEMAND** |
| TIM WILLIAMS, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>ELLIS YAN, *et al.*,<br><br>Defendants. | No. 1:15-cv-00398-DCN |
| DANIEL V. LEACH, JR., Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>TCP INT'L HOLDINGS LTD., *et al.*,<br><br>Defendants. | No. 1:15-cv-0917-GHW |

**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ....1

II. ORGANIZATION OF THIS COMPLAINT ....1

III. NATURE OF THE ACTION ....2

IV. JURISDICTION AND VENUE FOR ALL CLAIMS ....3

V. THE PARTIES FOR ALL CLAIMS ....4

A. The Plaintiff ....4

B. The Corporate Defendant ....4

C. The Individual Defendants ....4

D. The Underwriter Defendants ....5

VI. PLAINTIFF'S CLASS ACTION ALLEGATIONS FOR ALL CLAIMS ....6

VII. SUBSTANTIVE ALLEGATIONS OF THE SECURITIES ACT CLAIMS ....9

A. Background ....9

B. TCPI Becomes a Public Company ....13

VIII. VIOLATIONS OF THE SECURITIES ACT ....22

A. TCPI Conducts the Offering ....23

B. The Securities Act Defendants' Untrue or Misleading Statements and Omissions of Material Facts ....23

C. The Offering Materials Omitted Information that Was Required to Be Disclosed Under Item 303 ....28

D. The Offering Materials Omitted Information that Was Required to Be Disclosed Under Item 503 ....30

COUNT I ....30

COUNT II ....32

COUNT III ....33

**Page**


IX. EXCHANGE ACT CLAIMS ....................34

A. Defendants' False and Misleading Statements ....................34

B. The Truth Emerges ....................37

C. Post-Class Period Allegations ....................38

D. Loss Causation ....................39

E. Additional Allegations of Scienter ....................42

F. Presumption of Reliance ....................44

G. No Safe Harbor ....................46

COUNT IV ....................47

COUNT V ....................51

JURY TRIAL DEMANDED ....................53

## I. INTRODUCTION

1. Lead Plaintiff City of Warren Police & Fire Retirement System ("Plaintiff") brings this federal class action individually and on behalf of all persons or entities that purchased and/or acquired the common stock of TCP International Holdings Ltd. ("TCPI" or "Company") from June 26, 2014 through February 26, 2015, inclusive ("Class Period") seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC"), 17 C.F.R. §240.10b-5, and §§11, 12(a)(2), and 15 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§77k, 77l(a)(2), and 77o. Plaintiff makes the following allegations based upon the investigation undertaken by its counsel, which included a review of SEC filings made by TCPI, as well as securities analysts' reports, advisories, press releases, media reports, consultation with experts, other public statements issued about or by the Company, including information readily obtainable on the Internet, and interviews with factual sources, including individuals formerly employed by TCPI. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## II. ORGANIZATION OF THIS COMPLAINT

2. This Second Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws ("Complaint") is divided into three parts. The first part of this Complaint contains allegations common to all claims, including Nature of the Action (Section III), Jurisdiction and Venue (Section IV), Parties (Section V), Class Allegations (Section VI), and Substantive Allegations (Section VII). The second part (Section VIII) sets forth Plaintiff's strict liability and non-fraud claims against Defendants under Sections 11, 12(a)(2), and 15 of the Securities Act, on behalf of all those who purchased TCPI common stock in and/or traceable to the TCPI's initial

public offering ("IPO" or "Offering"). The third part of the Complaint (Section IX) sets forth Plaintiff's fraud-based claims on behalf of all purchasers of TCPI common stock during the Class Period under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. Plaintiff's Securities Act claims in the first part of this Complaint are pled separate and apart from the fraud-based Exchange Act claims. The Securities Act claims do not incorporate by reference, or otherwise rely upon, any allegations, particularly the scienter allegations, pled in support of the Exchange Act claims set forth in Section IX of the Complaint, and, therefore, Plaintiff's strict liability allegations in support of the Securities Act claims are pled under notice pleading standards of Rule 8(a) of the Federal Rules of Civil Procedure.

## III. NATURE OF THE ACTION

3. Plaintiff purchased TCPI common stock during the Class Period as set forth in its certification [Dkt. No. 23-3]. With respect to the class of open-market purchasers of TCPI common stock, the Defendants are TCPI, the Company's former Chief Executive Officer ("CEO"), Chairman and director Ellis Yan ("Yan"), and the Company's Chief Financial Officer ("CFO") and Treasurer Brian Catlett ("Catlett"). Defendants Yan and Catlett are referred to collectively as the "Individual Defendants" (the Individual Defendants, together with TCPI, and the Underwriter Defendants, defined below, are referred to collectively as "Defendants").

4. In addition to bringing claims on behalf of open market purchasers of TCPI common stock, this action is also brought on behalf of a class ("Class") consisting of all shareholders that acquired the common stock of TCPI pursuant or traceable to the Registration Statement on Form S-1, which was filed with the SEC on April 9, 2014, amended on May 21, 2014, and ultimately

declared effective on June 25, 2014 ("Registration Statement"),[1] seeking to pursue remedies under Sections 11, 12(a)(2), and 15 the Securities Act.

## IV. JURISDICTION AND VENUE FOR ALL CLAIMS

5. The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§77k, 77l(a)(2), and 77o, and rules promulgated thereunder by the SEC.

6. The Exchange Act claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rules 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

7. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 22 of the Securities Act, 15 U.S.C. §77v, and/or Section 27 of the Exchange Act, 15 U.S.C. §78aa.

8. Venue is proper in this District pursuant to 28 U.S.C. §1391(b)-(c), and Section 22 of the Securities Act, and/or Section 27 of the Exchange Act. The acts and conduct complained of herein occurred in substantial part in this District. Additionally, Defendant Yan resides in this District, and the Company operates in this District.

9. In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications and the facilities of the New York Stock Exchange ("NYSE").

---

[1] TCPI filed its Prospectus on June 27, 2014. The Registration Statement and Prospectus are collectively referred to herein as the "Registration Statement," "Prospectus," or "Offering Materials."

## V. THE PARTIES FOR ALL CLAIMS

### A. The Plaintiff

10. Plaintiff City of Warren Police & Fire Retirement System, an institutional investor appointed Lead Plaintiff by the Court in an Order dated May 29, 2015, purchased TCPI common stock, as set forth in the above-referenced certification and incorporated herein by reference, pursuant to and/or traceable to the IPO and was damaged thereby.

### B. The Corporate Defendant

11. Defendant TCP International Holdings Ltd. is a Switzerland corporation with its principal executive offices located at Alte Steinhauserstrasse 1, 6330 Cham, Switzerland. TCPI also maintains an office at 325 Campus Drive Aurora, Ohio 44202.

### C. The Individual Defendants

12. Defendant Ellis Yan served as TCPI's CEO, Chairman from 2010 until June 30, 2015, and continues to serve as Chairman of the Board of Directors. As of November 24, 2014, Defendant Yan owned approximately 41.8% of all outstanding common stock of the Company. His daughter, Lillian Yan, is a beneficiary of a trust that owns approximately 8.1% of all outstanding common stock of the Company. He holds a Bachelor's Degree in Accounting from Cleveland State University and received an Honorary Doctor of Business Administration Degree from Cleveland State University. Defendant Yan was a signatory to the Company's Registration Statement in connection with the IPO.

13. Defendant Brian Catlett has served as TCPI's CFO and Treasurer since January 2014 after serving as the Company's Senior Vice President of Global Finance since 2012. For over 25 years, Defendant Catlett has served in various executive capacities including CFO and managing partner of a private equity fund. From 2004 until 2012, Defendant Catlett was a partner in Consumer Innovation Partners, a consumer products private equity fund. Defendant Catlett holds a Bachelor's

Degree in Business Administration from the University of Iowa. Defendant Catlett was a signatory to the Company's Registration Statement in connection with the IPO.

14. The Defendants named in ¶¶12-13 are collectively referred to herein as the "Individual Defendants."

15. Each of the Individual Defendants participated in the drafting, preparation, and/or approval of various untrue and misleading statements contained in the documents filed by the Company with the SEC in connection with the Offering. The Individual Defendants signed the Registration Statement issued in connection with the IPO, ensuring the truth and accuracy of the various statements contained in therein.

**D. The Underwriter Defendants**

16. Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") is an investment bank located in New York, New York that offers securities brokerage and investment advisory services to both domestic and international private clients and institutions and correspondent clearing services to broker-dealers. Deutsche Bank acted as an underwriter of TCPI's IPO, helping to draft and disseminate the Offering materials.

17. Defendant Piper Jaffray & Co. ("Piper Jaffray") is an investment bank and asset management firm located in Minneapolis, Minnesota that offers financial advisory and security brokerage services. Piper Jaffray acted as an underwriter of TCPI's IPO, helping to draft and disseminate the Offering materials.

18. Defendant Canaccord Genuity Inc. ("Canaccord") is a global, full service investment bank focused on growth companies, with operations in ten countries worldwide. Canaccord acted as an underwriter of TCPI's IPO, helping to draft and disseminate the Offering materials.

19. Defendant Cowen and Company, LLC ("Cowen") is a diversified financial services firm that provides investment management, investment banking, research, and sales and trading

services. Cowen acted as an underwriter of TCPI's IPO, helping to draft and disseminate the Offering materials.

20. The Defendants named in ¶¶16-19 are collectively referred to herein as the "Underwriter Defendants." The Underwriter Defendants participated in the drafting and dissemination of the Registration Statement and collectively received discounts and commissions of approximately $5.5 million in connection with the IPO.

21. The Underwriter Defendants failed to perform adequate due diligence in connection with their role as underwriters and were negligent in failing to ensure that the Registration Statement was prepared properly, accurately, and free from misstatements or omissions of material fact. The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

## VI. PLAINTIFF'S CLASS ACTION ALLEGATIONS FOR ALL CLAIMS

22. Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all those who purchased and/or acquired TCPI common stock during the Class Period, including all those who purchased or otherwise acquired TCPI common stock in and/or traceable to the IPO. Excluded from the Class are Defendants named herein, members of the immediate families of each of the Defendants, any person, firm, trust, corporation, officer, director, or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any Defendant, and the legal representatives, agents, affiliates, heirs, successors-in-interest, or assigns of any such excluded party.

23. The members of the Class are so numerous that joinder of all members is impracticable. TCPI issued 7.14 million shares in the IPO. Additionally, TCPI has millions of shares of common stock outstanding that are actively traded on the NYSE. According to TCPI's

SEC filings, as of November 1, 2014, TCPI had approximately 27.7 million shares of common stock outstanding.

24. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by TCPI or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

25. Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff has retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intends to prosecute this action vigorously.

26. Plaintiff's claims are typical of the claims of the other members of the Class because Plaintiff's and all the Class members' damages arise from and were caused by the same false and misleading representations and omissions made by or chargeable to Defendants. Plaintiff does not have any interests antagonistic to, or in conflict with, the Class.

27. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members to seek redress for the wrongful conduct alleged. Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

28. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants' acts as alleged herein violated the securities laws;

(b) with respect to Plaintiff's claims under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, whether: (i) the documents, reports, filings, releases, and statements disseminated by Defendants during the Class Period misrepresented material facts about the business, performance, and financial condition of TCPI in violation of the Exchange Act; (ii) Defendants participated in and pursued the common course of conduct and fraudulent scheme complained of herein in violation of the Exchange Act; and (iii) Defendants acted knowingly or with deliberate recklessness in misrepresenting material facts in violation of the Exchange Act;

(c) with respect to Plaintiff's claims under Section 11 of the Securities Act, whether the Registration Statement was negligently prepared and contained inaccurate statements of material fact and/or omitted material information required to be stated therein; and

(d) to what extent the members of the Class have sustained damages and the proper measure of damages.

29. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VII. SUBSTANTIVE ALLEGATIONS OF THE SECURITIES ACT CLAIMS

### A. Background

30. Together with its subsidiaries, TCPI designs, develops, manufactures, and delivers energy efficient lamps, fixtures, and Internet-based lighting control solutions.

31. "Concerted energy conservation efforts, overburdened electricity grids and an increased drive towards energy efficient lighting have led many governments around the world, including such key markets as the United States, Europe, Japan, China, Mexico, and Brazil, to partially restrict or completely ban the sale of certain inefficient lighting technologies, primarily incandescent. Because conventional incandescent lamps use high levels of energy relative to more energy efficient alternatives, much of the regulations have been focused on phasing out conventional incandescent lamps by imposing minimum light efficiency standards above levels that can be achieved by conventional incandescent technology. In December 2007, the U.S. federal government enacted the Energy Independence and Security Act ("EISA"), which requires all general purpose lamps to be approximately 30% more energy efficient than conventional incandescent lamps. The EISA gradually introduced the regulation by banning 100W incandescent lamps in 2012, 75W lamps in 2013, and 40W to 60W incandescent lamps in 2014."[2]

32. "There are six primary types of light technologies that are sold globally: LED, CFL, LFL, HID, halogen and conventional incandescent."[3] TCPI holds itself out as a leading global provider of energy efficient LED and CFL lighting technologies.[4]

---

[2] TCPI's Prospectus, filed with the SEC on June 27, 2014, at 75, http://www.sec.gov/Archives/edgar/data/1545391/000119312514253555/d693313d424b4.htm.

[3] *Id.* at 73.

[4] *Id.* at 71.

33. The Company states that it has "established the largest number of Energy Star® compliant lighting products for LEDs [light-emitting diodes] and CFLs [compact fluorescent lamps] combined"[5] and claims that its products are UL certified. UL and Energy Star® approvals are critically important to lighting manufacturers for such approval directly impacts the potential market of lighting products.

34. UL is an American worldwide safety consulting and certification company that participates in the safety analysis of many new technologies and the drafting of safety standards for electrical devices and components. UL provides safety-related certification, validation, testing, inspection, auditing, advising, and training services to a wide range of clients, including manufacturers, retailers, policymakers, regulators, service companies, and consumers. In order to receive UL approval, a product must be submitted to UL and tested and approved by UL. Once approved, the product is provided a unique UL number and can be labeled UL approved. Architects and builders will require that products have UL certification in order to be specified for construction projects. In other words, if a product is not UL approved, the market for that product is extremely limited.

35. Energy Star® is an international standard for energy efficient consumer products originated in the United States. Devices carrying the Energy Star® service mark, such as computer products and peripherals, kitchen appliances, buildings, and other products, generally use 20% - 30% less energy than required by federal standards. The Energy Star® designation is a significant feature for the Company's products, and it helps qualify those products for rebates provided by utility companies throughout the United States. The Energy Star® designation cannot be placed on any product without prior approval from Energy Star®.

[5] *Id.*

36. "LEDs produce light by passing electrical current through a semiconductor that generates visible light. LED lighting products offer numerous benefits over other lighting technologies such as greater energy efficiency, longer lifetime, improved durability, greater environmental benefits compared with incandescents, digital controllability, smaller size and lower heat output. LED lamps typically last 25,000 to 50,000 hours and are up to twice as efficient as fluorescent lamps and up to six times as efficient as incandescent lamps. As a result, LEDs offer very low operating costs since they use less electricity and have the longest lifetime of any available lighting technology. LED lamps accounted for just $8.9 billion of sales globally in the general lighting market in 2011 but are projected to grow rapidly, totaling $81.2 billion in 2020, representing a 27.9% [Compound Annual Growth Rate] in that period. The major trends expected to drive growth in the adoption of LED lamps are rapid cost reductions and continuous improvement in performance and quality. Prices of LED lamps are substantially higher than almost all other technologies, but are expected to fall sharply, driven largely by decreasing costs and increasing efficacies at the LED chip level. As prices continue to fall over the long-term, LED lamps are estimated to gain significant market share among lighting technologies, growing from just 11.7% in 2011 to 70.7% by 2020."[6]

37. "CFL lamps produce light by passing an electric arc between two tungsten cathodes in a phosphor coated tube that is filled with low-pressure mercury vapor and other gases. CFL lamps require an electronic ballast, which is integrated into the screw-in base, to provide the required voltage at start-up and control the flow of current to maintain optimum light output. Compared to incandescent lamps, CFLs use less energy to produce the same light output, last longer and generate less heat. CFLs are 75% more efficient than incandescent lamps and typically last between 10,000

---

6 *Id.* at 73-74 (citing McKinsey & Company: "Lighting the way: Perspective on the global lighting market" (2d ed. Aug. 2012)).

and 20,000 hours. These factors allow CFLs to offer lower operating costs than incandescent lamps, as CFLs use less electricity and need to be replaced much less frequently. The market for CFLs has also been bolstered by continued improvements in light quality and features such as dimming and rapid warm up. CFLs represent one of the most cost competitive alternatives to incandescent lamps and fixtures, which will drive near-term growth as inefficient incandescent lighting products are phased out in many countries. The use of CFLs is expected to bridge the market until more efficient and technologically advanced solutions, such as LEDs, become cost competitive. Despite expected near-term growth, the global market for CFLs is expected to contract from $13.2 billion in 2011 to $6.1 billion in 2020."[7]

38. In 1989, Defendant Yan, together with his brother, began developing, manufacturing, and assembling lighting products in China. TCPI was formed a few short years later, in 1993. From the beginning, Defendant Yan's main focus was to revolutionize the lighting industry and energy efficient lighting solutions. In 1996, TCPI introduced a ground-breaking energy efficient compact fluorescent lamp, the "SpringLamp," which revolutionized the residential lighting industry for the first time since Thomas Edison's invention of the light bulb.[8] In less than five years, TCPI was able to broaden the CFL market with more advanced CFL design options, such as the "mini-twist," cold cathode, and covered CFLs.[9]

39. As CFLs became more popular with consumers, TCPI continued to meet increasing demand by manufacturing over 900,000 CFLs per day in 2006, and boosted production to over 1.1

---

[7] *Id*. at 74.

[8] *Get to know a NEO CEO* (Feb. 2010), http://www.gcpartnership.com/Media-Center/~/media/Files/Membership/CEO%20profile%20Yan%202%2010.ashx.

[9] Milli Jimenez, *TCPI Lighting Blog* (Oct. 3, 2014), http://blog.tcpi.com/2014/10/03/history-of-tcp/.

million CFLs per day in 2007. That same year, President George Bush signed the Energy Independence and Security Act of 2007 into effect, which started the phase out of incandescent light bulbs and promoted more energy efficient options.

40. TCPI continued to evolve and improve the energy efficient lighting industry with its introduction of TruDim®, the world's first microchip-controlled CFL in 2011. In 2012, TCPI earned the prestigious Best in Class recognition for its first generation LED by "Top Ten USA." The research and innovation continued the following year with the launch of a new smart lighting system, Connected by TCP®, in 2013, which allows users to control their lighting with just their smart phone or tablet.[10]

**B. TCPI Becomes a Public Company**

41. On April 9, 2014, TCPI filed a Draft Registration Statement on Form S-1 with the SEC.[11] A second draft was filed on May 21, 2014.[12] On June 25, 2014, following several amendments, the SEC declared the Registration Statement effective,[13] pursuant to which the Company offered 7,142,858 of its common shares for $11.00 each.[14] In connection with the IPO, the Company granted the underwriters a 30-day option to purchase up to an additional 1,071,428 common shares at the IPO price less underwriting discounts and commissions.[15]

---

10 *Id.*

11 TCPI Form S-1 Draft Registration Statement (Apr. 9, 2014), http://www.sec.gov/Archives/edgar/data/1545391/000095012314003670/filename1.htm.

12 TCPI Form S-1 Draft Registration Statement (May 21, 2014), http://www.sec.gov/Archives/edgar/data/1545391/000119312514208091/d693313ds1.htm.

13 Notice of Effectiveness, http://www.sec.gov/Archives/edgar/data/1545391/999999999514001907/xslEFFECTX01/primary_doc.xml.

14 *See* Prospectus at cover page.

15 *Id.*

42. TCPI common stock was listed and began trading on the NYSE under the ticker symbol "TCPI" on June 26, 2014. A total of 27,696,288 outstanding common shares (or 28,767,716 common shares if the underwriters exercise in full their option to purchase additional shares) were available immediately after the Offering. The Company raised over $73 million in the IPO.

43. The Prospectus was filed with the SEC on June 27, 2014.

44. As would later become clear, Defendant Yan – on whose services with respect to sales, product development and overall corporate administration the Company was "particularly dependent"[16] – ruled TCPI with an iron fist since its founding in 1993 and it was he who caused the Company to completely disregard its internal quality assurance and control processes, thereby selling mislabeled products – or products that had been improperly labeled – as UL and Energy Star® approved.

45. Specifically, the Company utilized "golden samples" for testing purposes. A "golden sample" is used in the lighting industry to refer to a sample product that has been built and tested to ensure that it will receive UL certification. It is supposed to be representative of the product that will later be mass produced once it is approved. It is improper to knowingly build a superior sample in order to receive UL listing if the mass produced product will be inferior. With Defendant Yan at the helm, however, TCPI used "golden samples" made with quality materials (and presumably, more likely to meet industry standards and perform well when tested), but then used inferior materials when the products were mass produced.

46. As a result, it was not uncommon for products to be returned by customers because the performance of the product did not match the specifications.

---

[16] TCPI's Amendment No. 3 to Form S-1, filed with the SEC on June 24, 2014, at 16, http://investors.tcpi.com/secfiling.cfm?filingID=1193125-14-247591&CIK=1545391, Prospectus at 16.

47. The fact that TCPI was building products before the proper UL certifications had been received was a topic of various discussions within the Company; in fact, Defendant Yan directed team members on several occasions to begin building products prior to receipt of UL certifications. Meeting attendees would question the legality of Defendant Yan's directive. They would further comment that building products prior to the receipt of UL listings or appropriate certifications "should not be done." Notwithstanding, whether building products prior to receiving UL certifications was proper and/or legal was of no moment to Defendant Yan who took the view that it could be done and should be done.

48. The market learned about the Company's misconduct after the market closed on February 26, 2015, when Laura Hauser ("Hauser"), the Company's (now former) General Counsel, Secretary, and Chief Compliance Officer ("CCO"), filed a lawsuit against TCPI, its subsidiary, Technical Consumer Products, Inc., and Defendant Yan, styled as *Hauser v. Technical Consumer Products, Inc.*, No. CV 15 841097, in the Court of Common Pleas in Cuyahoga County, Ohio ("*Hauser* Action"). The following allegations are taken directly from the complaint filed in the *Hauser* Action (the "*Hauser* Complaint"), which is attached hereto as Exhibit A.

49. As General Counsel and CCO, Hauser had a wide array of duties and responsibilities, including, but not limited to, leading corporate strategic and legal initiatives; providing legal counsel to senior management and the Board of Directors; managing legal affairs; assuring legal compliance with state, federal, and international regulations, statutes, and common law; and enforcing the business conduct policies set forth by TCPI. *Hauser* Complaint at ¶11. In this capacity, Hauser reports directly to Defendant Yan.

50. The *Hauser* Action alleges that "[i]n August 2014, 40,000 LED lamps designated specifically for the Cinemark movie theatres were manufactured with the UL mark, ***pursuant to***

***Yan's direct order***, before they received UL listing approval/certification." *Id*. at 23 (emphasis added).

51. The *Hauser* Action also alleges that Defendant Yan pressured TCPI's Chinese manufacturing facility to increase production, lower costs, and improve margins, which led to the manufacturing of non-compliant products that were improperly labeled with the UL mark. *Id*. at ¶22. For example, it was discovered that over 900,000 units of a particular LED product had been produced with the UL symbol affixed thereto, but that ultimately "did not match the design for the product as submitted to UL, or else the products were mislabeled as another product and, therefore, were not in compliance with the TCP UL file for that particular product and design construction." *Id*. at ¶29.

52. "For other models of that same product, there were component changes implemented during manufacturing that were inconsistent with the product/model UL file design construction." *Id*. No one within the Company's compliance, engineering, or quality assurance departments was aware of the design construction changes for the products at issue. *Id*. at ¶30.

53. Hauser alerted the executive management team, production, and compliance officers, as well as Defendant Yan. *Id*. at ¶33. Thereafter, Defendant Yan summoned the compliance manager and LED product manager into the conference room and stated:

- He knows that the compliance team has been talking with others about the UL certification and legal issues and that it has to stop.
- He has to focus on the numbers; compliance and engineering should follow whatever he does no matter what.
- The product should be released into the market because he is concerned about the numbers; they should all stop getting in the way of the numbers.

- If the compliance team in the United States fails to do what he tells them to do, he will fire them all[.][17]

*Id*. at ¶34.

54. According to the *Hauser* Action, Hauser involved the Company's Audit Committee[18] in her concerns about, among other things, violations of federal law including the Consumer Product Safety Act. *Id*. at ¶36.

55. To address Defendant Yan's "management approach and conduct" and "certain implications thereof," the Audit Committee conducted an investigation beginning in December 2014.[19]

56. As a result of its investigation, the Audit Committee (together with its independently retained counsel) found that Defendant Yan had engaged in the following misconduct:

- Taking unilateral action and disregarding the need for fact-based decision-making, which requires leveraging the financial organization to analyze major business decisions before they are made.

---

[17] It was not uncommon for Defendant Yan to lose his temper. In fact, following a meeting regarding Defendant Yan's misconduct, but prior to filing her complaint, Hauser filed a police report with the Cleveland Heights Police Department, attached hereto as Exhibit B, that described Defendant Yan's "explosive" temper toward Hauser. *Id.* at 2, 4. According to the police report, Defendant Yan contacted Hauser at her residence and stated that she "shouldn't have done it" (referring to comments made at the meeting) and that she would be "sorry." *Id.* at 2, 3.

[18] According to the *Hauser* Action, the Audit Committee of the Board of Directors "was established for the purpose of assisting the Board of Directors in fulfilling its legal and fiduciary obligations with respect to matters involving the accounting, auditing, financial reporting, internal controls and legal compliance function of the Company and its subsidiaries, including, but not limited to, assisting the Board in providing oversight over the integrity of the Company's financial statements and the Company's compliance with legal and regulatory requirements." *Id*. at ¶35; *see also* Prospectus at 100.

[19] TCPI's Form 10-K for its fiscal year ended December 31, 2014, filed with the SEC on April 15, 2015 ("2014 10-K"), at 31, http://www.sec.gov/Archives/edgar/data/1545391/0001628280 15002309/tcpi2014123110k.htm; TCPI's Form 10-K/A, filed with the SEC on April 30, 2015, at 6, https://www.sec.gov/Archives/edgar/data/1545391/000162828015003328/tcpi2014123110ka.htm.

- Limiting visibility of financial information and accountability to the global CFO, which is necessary to ensure independence and integrity of the data.

- Not following proper processes for commercial price changes and obsolescence exposure, or documenting them.

- Failure and refusal to consult with executive managers on matters within their scope of responsibility before taking direct personal action or issuing orders for others to act, including unilateral requests to directors for program approval. [R]egular disregard by you of reporting relationships, via reaching around executive managers, bypassing established processes and putting employees in “no win” situations.

- ***Bypassing regulatory (UL, CE, EnergyStar etc.) and supplier certification processes.***

- ***Overriding and/or disregarding Company policies on matters such as*** capital expenditure, customer credit and operating expenditure approvals; ***new product development process; product design and safety certification***; business conduct manual; and code of ethics for principal executive and senior financial officers.

- Repeated instances of personally antagonistic and disrespectful interaction with employees at multiple levels within the Company, with accompanying serious morale and employee retention difficulties.

- Imposition of such extreme and unrealistic performance demands and pressures on employees as to potentially promote inappropriate employee conduct damaging to the Company.

*Hauser* Action at ¶¶36, 42.

57. According to the *Hauser* Action, “[t]he Audit Committee determined that each of the matters addressed in its memorandum reflects [Defendant Yan’s] unwise, inappropriate and/or unlawful decision-making. The Audit Committee advised [Defendant Yan] of the need for a proper ‘tone at the top’ of the organization; developing and relying upon sound, supportable financial plans and planning functions; requiring internal controls that are effective and not disregarded or overridden; ensuring proper focus by the Company on compliance with legal and regulatory

requirements; maintaining the integrity of the Company's financial reporting; and in general making sure that there is a collaborative effort among each and every member of the executive management team to manage the Company's overall risk from multiple sources." *Id*. at ¶44.

58. "The Audit Committee concluded that the manner in which [Defendant Yan] had been operating the Company must change 'promptly and substantially.' The Audit Committee set forth very specific directives in the memorandum, including, but not limited to, the following:

> ***No product destined for sale in the United States is to be manufactured or assembled by the Company or marketed with the UL logo unless and until [it] has been tested and received UL listing certification, all in the normal course of business. . . . The same directives apply to the EnergyStar® program as well. . . . You have no authority to give, and are forbidden from giving, either directly or indirectly, any contrary instructions explicitly or implicitly."***

*Id*. at ¶45.

59. On February 27, 2015, the Company issued a press release announcing the filing of the *Hauser* Action, which also was filed with the SEC as an exhibit to a Form 8-K filed March 3, 2015 ("March 3, 2015 8-K").[20]

60. Also attached as an exhibit to the March 3, 2015 8-K was a press release issued by the Company on March 2, 2015, responding to the *Hauser* Action[21] wherein it announced that it "takes these allegations seriously" and that "the one claim against TCP is without merit, and TCP intends to vigorously defend against it. TCP does not intend to comment on the specific allegations and claims made against Ellis Yan."[22] TCPI further announced that "[c]onsistent with TCP's commitment to high quality products, the Company has voluntarily chosen to conduct additional levels of quality

---

[20] TCPI's March 3, 2015 8-K, Ex. 99.1, http://investors.tcpi.com/secfiling.cfm? filingID=1628280-15-1403&CIK=1545391.

[21] *Id*. at Ex. 99.2.

[22] *Id*.

control on its products. TCP believes this is appropriate and is doing so out of an abundance of caution, and TCP has engaged an outside testing firm to support these efforts. While products are available for shipping, the Company expects some deliveries may be delayed for a short time period, and TCP will work closely with customers to minimize any potential impact on orders."[23]

61. On the day the *Hauser* Action was filed, TCPI halted any shipments from the warehouse and warehouse employees were sent home early. The Company continued to withhold shipments pending the Audit Committee review, which began on or about March 2, 2015.

62. The *Hauser* Action revealed many levels of misconduct that were ongoing at the Company. Not only were the issues with the Company's quality control and processes exposed, as described above, but the true nature of the later implicated "tone at the top" were revealed. For example, the *Hauser* Action alleges that Defendant Yan: had an "explosive" temper (¶14); "utilize[d] abusive language and demeaning conduct in his interaction with many employees" (¶13); and "made it no secret that he was the one in charge of, and ultimately responsible for, making all decisions . . .; in other words, Yan made it clear that he was the 'boss'" (¶13).

63. The Company ultimately acknowledged the misconduct on April 15, 2015 when it announced that Defendant Yan would not be renewing his employment contract with the Company (*i.e.*, that he would be stepping down from his role as CEO), but also that the Company had discovered "material weakness in its internal control."

64. Additionally, on April 15, 2015, the Company announced that Defendant Yan would be stepping down as CEO on June 30, 2015. The press release reported that he would continue to

---

[23] *Id.*

serve as Chairman of the Board of Directors and would be available to consult with the new CEO following that appointment.[24]

65. The Company also filed its 2014 10-K that same day. In the 2014 10-K the Company ***admitted*** that as of December 31, 2014, "due to a material weakness in our internal control over financial reporting . . . our disclosure controls and procedures were not effective." *Id*. at 78. Specifically, the Company disclosed:

> ***Our Chief Executive Officer's actions were inconsistent with setting an appropriate tone at the top by failing to adhere to the Company's established policies and procedures. Our Chief Executive Officer bypassed reporting lines established to enable the execution of authorities and responsibilities***, which facilitate the flow of information to manage the activities of the Company and ensures that financial reporting matters could be adequately evaluated in a timely manner.

*Id.*

66. The 2014 10-K also announced the findings of the Audit Committee report with respect to its investigation concerning the management approach and conduct of Defendant Yan and "certain implications thereof." Specifically the 2014 10-K reported the following findings:

- Structural and management circumstances at the Company, generally centered on the Chief Executive Officer's ubiquitous and highly personalized approach to running the Company, need to be rectified.

- Despite a long history of designing and manufacturing quality products***, the Company would benefit from improvements in its process for securing and documenting UL listings for its products.***

- There were no indications that any illegal acts occurred that could be expected to have a material impact on the Company's financial statements for 2014.[25]

---

[24] TCPI's Form 8-K, Ex. 99.2, http://www.sec.gov/Archives/edgar/data/1545391/000162828015002313/exhibit992.htm.

[25] 201410-K at 31-32.

67. By publishing the Audit Committees findings and the Company's disclosures of material weaknesses in its internal controls in its fiscal 2014 annual report, which covered the Company's entire fiscal year, the Company acknowledged that these findings and/or weaknesses existed prior to the IPO, according to the applicable SEC rules governing these categories of disclosures, as further detailed below.

68. The Company reiterated its "material weakness" disclosure in its Forms 10-Q for the periods ending March 31, 2015 and June 30, 2015, filed with the SEC on May 8, 2015 and August 7, 2105, respectively, confirming that the material weakness had not been fully remediated as of June 30, 2015.[26]

69. The Company also disclosed that the SEC had commenced a "formal, non-public investigation into issues that overlap" with this private securities litigation and that it had settled the *Hauser* Action for $3.9 million. *Id*. at 9.

70. The market reacted swiftly to the news of the *Hauser* Action. Shares of TCPI fell $3.67 per share, or over 57%, on unusually high and abnormal volume from its previous closing price to close at $2.74 per share on February 27, 2015, or approximately 75% less than the IPO price.

## VIII. VIOLATIONS OF THE SECURITIES ACT

71. The claims in Counts I-III are brought pursuant to Sections 11, 12, and 15 of the Securities Act. Counts I and II are brought against all Defendants, and Count III is brought against TCPI and the Individual Defendants. These claims, are in effect, a separate complaint. In the allegations and claims set forth herein, Plaintiff asserts strict liability claims pursuant to the Securities Act on behalf of itself and the Class. Plaintiff's claims are not based on any allegations of

[26] TCPI's Form 10-Q for the period ended June 30, 2015, at 21.

intentional, knowing, or reckless misconduct on behalf of any of the Defendants. Plaintiffs' claims do not, and are not intended to, allege fraud or sound in fraud - and Plaintiff specifically disclaims any allegations of fraud, scienter, or recklessness in connection with these non-fraud claims.

**A. TCPI Conducts the Offering**

72. TCPI completed its Offering on June 26, 2014. Among other things, the Offering Materials described TCPI's business and the nature of each of its products, set forth its historical financial data, described its growth strategies, and provided the terms of the Offering. The Offering Materials incorporated by reference the Prospectus and the exhibits to the Registration Statement. The Registration Statement was signed by the Individual Defendants.

**B. The Securities Act Defendants' Untrue or Misleading Statements and Omissions of Material Facts**

73. TCPI misleadingly represents that it designs, develops, manufactures, and delivers "high quality energy efficient lamps, fixtures and internet-based lighting control solutions." Its "internally developed driver, optical system, thermal management and power management technologies deliver a high standard of efficiency and light quality." The Company describes itself as having a "broad portfolio of advanced LED and CFL lamps and fixtures" that enables it to "address a wide range of applications required by [its] retail and [commercial and industrial ("C&I")] customers."[27]

74. In reality, however, the Registration Statement failed to disclose that the Company was producing products and labeling the products as UL and Energy Star® approved when no such approvals had been received.

75. The Prospectus described the Company's vertically integrated manufacturing process as a strategic advantage that allowed the Company to exercise unique control over product quality

[27] Prospectus at 71.

and stated that "[s]ubstantially all of [the Company's] products are manufactured in [its] four facilities in China."[28] For example, the Prospectus misleadingly described, in pertinent part:

> ***We believe our manufacturing operations provide us with a key competitive advantage in the market. We deploy advanced and highly automated manufacturing processes at all of our facilities. In addition, our facilities are integrated, resulting in substantial benefits in efficiency, production management and cost controls.***[29]

76. Committed to ensuring a high-quality products, the Company misleadingly touted its ongoing commitment to quality control procedures and testing:

> In order to ensure the consistent quality of our products, ***we apply our quality control procedures at each stage of our manufacturing process, ranging from inspection of raw materials through production and delivery***. ***We ensure that all raw materials, components, and finished products fulfill quality control requirements and standards.*** The following is a summary of our quality control procedures by stage of the manufacturing process:
>
> - Raw Materials–All raw materials and supplies are subject to sample inspections upon arrival. In addition, our team makes regular and unannounced visits to raw material suppliers to ensure we have an in-depth understanding of our suppliers' quality.
>
> - ***Semi-Finished Products–We conduct quality control tests at different points during the various production stages of our manufacturing process to ensure that there is no loss of quality anywhere in the production of our products. Our testing methods include visual inspection, key specification and functional checks.***
>
> - ***Finished Products–Our quality control staff administers tests on finished and packaged products to assess product safety, structural integrity, durability of packaging, conformity with design and color specification and accuracy of printed packaging materials.***
>
> ***We are firmly committed to maintaining high-quality manufacturing and R&D facilities.*** The majority of our manufacturing plants are certified by the International Organization for Standardization, or ISO, and two of our R&D labs are accredited under ISO/IEC 17025:2005. ***Our commitment to quality assurance and control throughout every stage of the production of our lamps is a critical underlying***

---

[28] *Id*. at 48.

[29] *Id*. at 83.

> ***component of our ability to deliver the high quality products to our customers in a timely fashion.***
>
> * * *
>
> ***To help ensure that we produce high quality products, we employ quality-assurance measures to govern the design and development process. We have established an Advanced Product Quality Planning process to test and analyze the quality of potential prototypes throughout the proof-of-concept, design and development, and validation and product launch stages. Thorough reviews are held between each of the development stages to ensure that every product that reaches the market upholds the high quality standard set by our existing products. Additionally, our continual improvement program incorporates updated customer requirements and satisfaction reviews into our product quality data analysis to confirm the quality received by our customers and to respond to product issues in real time.***[30]

77. Further, the Prospectus included a misleading description of TCPI's business as a leading global provider of "energy efficient" LED and CFL lighting, and described the Company as having the largest number of "Energy Star® compliant" lighting products for LEDs and CFLs combined. The Prospectus made numerous statements falsely describing the Company's so-called portfolio of efficient lighting products, misleadingly stating:

- ***Our high quality lighting*** solutions including lamps, indoor and outdoor fixtures and connected lighting products focus solely on the energy efficient lighting market. We have more than 750 LED SKUs and 2,500 CFL SKUs, which in 2013 together accounted for 92.4% of our net sales, as well as complementary lighting solutions that address specific customer needs.[31]

- Our focus on product development enables us to provide a wide range of advanced lighting products to our customers in a timely fashion. We operate product development facilities in Aurora, Ohio and Shanghai, China, ***where we focus on new technologies, increasing functionality, enhancing quality, improving manufacturing processes and reducing costs. We believe that our rigorous product development and testing processes led to our receipt of ENERGY STAR® Partner of the Year awards in 2013 and 2014, among other awards.*** We have developed driver technologies for our CFL products, including our patented TruDim® and TruStart® technologies. We have

---

[30] *Id*. at 82, 84.

[31] *Id*. at 76.

> leveraged these existing technologies for our LED drivers, which has helped us achieve a high standard of efficiency.[32]

78. The Prospectus additionally touted the Company's alleged commitment to achieving and receiving Energy Star® recognition and compliance. For example, the Prospectus misleadingly described:

- Once the designs are complete, we test these products in our EPA recognized photometry labs for ENERGY STAR® qualification. We have accredited labs in both US and China facilities. ***We are committed to the ENERGY STAR® program as it maximizes our sales opportunities due to the many rebates offered for ENERGY STAR® qualified LED products. We have established the largest number of Energy Star® compliant lighting products for LEDs and CFLs combined. We also have an accredited UL lab in which we can validate and ensure the safety of our global products.***[33]

- ***We have the leading number of ENERGY STAR® compliant CFL lamps . . . . Our CFL technologies are available in the majority of our CFL product lines***, including SpringLamps™, A lamps, globes, and parabolic aluminized reflectors, or PARs.[34]

- ***We believe that our rigorous product development and testing processes led to our receipt of ENERGY STAR® Partner of the Year awards in 2013 and 2014, among other awards***. We have developed driver technologies for our CFL products, including our patented TruDim® and TruStart® technologies. We have leveraged these existing technologies for our LED drivers, which has helped us achieve a high standard of efficiency.[35]

79. Finally, the Prospectus misleadingly described how the Company was positioned to implement several growth strategies, and stated, in pertinent part:

> ***Our goal is for our customers and end-users to further associate the TCP brand with high quality lighting solutions that offer industry leading technology.*** We have built strong brand awareness and customer recognition within the C&I channel. For the retail channel, we currently sell our products primarily under private label, whereby our retail customers then re-sell these products to consumers under their

---

32 *Id*.

33 *Id*. at 78.

34 *Id*. at 79.

35 *Id*. at 76.

> own brand names. Recently, we have begun introducing TCP-branded and co-branded products into our retail channel to increase TCP brand awareness with consumers. To further promote TCP brand awareness, we intend to use a targeted media campaign to leverage directed internet advertising and social media, as well as strategically placed in-store interactive video and displays. We believe that our smart lighting platform for the connected home and office will also increase brand recognition among consumers.[36]

80. The Company continued to make misleading statements regarding the quality of its products throughout the Class Period. Continuously touting its "high quality energy efficient lamps" and its "broad portfolio" of "the largest number of Energy Star® compliant lighting products for LEDs and CFLs combined."

81. The statements in the Offering Materials were materially misleading because they failed to disclose that: (a) the Company was manufacturing "high quality" and "energy efficient" lighting fixtures and labeling those products with UL and Energy Star® approval when no such approvals had been received; (b) as would later be revealed, Defendant Yan was circumventing corporate policies that impacted the manufacturing and quality control processes of these products which undermined the Company's standards and practices, such as "[b]ypassing regulatory (UL, CE, EnergyStar, etc.) and supplier certification processes," and "[o]verriding and/or disregarding Company policies on matters such as . . . product design and safety certification;" (c) as the Company would ultimately admit in its 2014 10-K, Defendant Yan's "actions were inconsistent with setting an appropriate tone at the top by failing to adhere to the Company's established policies and procedures;" (d) Defendant Yan's improper "tone at the top" predated both the IPO and the *Hauser* Action, as was memorialized in the police report filed by Hauser following an acrimonious meeting with Defendant Yan regarding his misconduct, which details Defendant Yan's "explosive" temper; and (e) the material weaknesses in its internal controls.

---

[36] *Id*. at 77.

82. The market reacted swiftly to the news of the *Hauser* Action. Shares of TCPI fell $3.67 per share, or over 57%, on unusually high and abnormal volume from its previous closing price to close at $2.74 per share on February 27, 2015, or approximately 75% less than the IPO price.

83. The timing and magnitude of TCPI's stock price decline negates any inference that the losses suffered by Plaintiff was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct. This point is evidenced by the chart above, which demonstrates the clear divergence of TCPI's stock price from the cumulative total returns of the NASDAQ Composite Index and NASDAQ Clean Edge Green Energy,[37] as the revelation of the truth became known to the market. Despite announcements in August and November 2014 regarding "lower than expected" and/or "flat" CFL sales quarter-over-quarter, the Company's stock price was buoyed – falling less than it would have or should have had the market been aware of the full extent of the Company's operational defects that affected the Company's LED product line as well.

### C. The Offering Materials Omitted Information that Was Required to Be Disclosed Under Item 303

84. The Offering Materials also omitted material information required by Item 303 of Regulation S-K. Item 303 requires the disclosure of all "known trends … that have had or that the registrant reasonably expects will have a material … unfavorable impact on … revenues." In addition to the identification of such "known trends," Item 303 specifically requires disclosure of: (a) whether those trends have had or are reasonably expected to have a material negative impact on revenue; and (b) the extent of any such impact on revenue.

[37] The 2014 10-K "compares the cumulative total return provided to shareholders of [TCPI's] common shares relative to the cumulative total returns of the NASDAQ Composite Index and NASDAQ Clean Edge Green Energy Index." *See id.* at 32.

85. Accordingly, as the SEC has repeatedly emphasized, the "specific provisions in Item 303 require disclosure of forward-looking information." Indeed, the SEC has stated that Item 303 is "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company … with particular emphasis on the registrant's prospects for the future." *See Management's Discussion and Analysis of Financial Condition and Results of Operation*, Securities Act Release No. 6835, 1989 WL 1092885, at *3 (May 18, 1989). Thus, "material forward looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects." *See Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operation*, Securities Act Release No. 8350, 2003 WL 22996757, at *11 (Dec. 29, 2003).

86. Disclosure of forward-looking information concerning the registrant's revenue is required by Item 303 "where a trend, demand, commitment, event or uncertainty is both [i] presently known to management and [ii] reasonably likely to have material effects on the registrant's financial condition or results of operations." *See Management's Discussion*, 1989 WL 1092885, at *4.

87. By the time of the Offering, the Company was not abiding by its quality control processes and procedures and was causing uncertified or mislabeled products to be produced and sold that were inferior to the "high quality," "energy efficient" light bulbs that the Company continuously touted. Indeed, according to the *Hauser* Action and the Audit Committee's investigation and findings, the Company ultimately disclosed material weaknesses in its internal controls, noting Defendant Yan's actions "were inconsistent with setting an appropriate tone at the top by failing to adhere to the Company's established policies and procedures." 2014 10-K at 78.

88. Accordingly, the Offering Materials' failure to disclose the Company's practice of circumventing its own quality control policies and procedures, thereby resulting in the improper labeling of its alleged "energy efficient" and "high quality" products constitutes a violation of Item 303 and renders the Offering Materials materially false and misleading.

**D. The Offering Materials Omitted Information that Was Required to Be Disclosed Under Item 503**

89. Likewise, the Offering Materials failed to comply with Item 503 of Regulation S-K, 17 C.F.R. §229.503(c), including, among other things, a "discussion of the most significant factors that make the offering speculative or risky." Here, one of the most significant factors that made the Offering speculative or risky to investors was the fact that, at the time of the Offering, the Company was completely disregarding its internal quality assurance and control processes, thereby causing mislabeled products – or products that had been improperly labeled – as UL approved and/or Energy Star® certified to be manufactured and sold.

90. Nowhere within the Offering Materials did TCPI disclose to investors that, as of the date of the Offering, such activity was occurring. Accordingly, disclosure of this material fact was required under Item 503.

91. TCPI's common shares were sold in the Offering at $11.00 per share and as of the filing of Plaintiff's Securities Act claims, were trading at $2.71.

**<u>COUNT I</u>**

**FOR VIOLATION OF SECTION 11 OF THE SECURITIES ACT AGAINST ALL DEFENDANTS**

92. Plaintiff repeats and realleges the allegations set forth in ¶¶1-91 above as though fully set forth herein. This claim is asserted against all Defendants.

93. This Count is brought pursuant to Section 11 of the Securities Act on behalf of the Class, against all Defendants.

94. The Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

95. Defendants are strictly liable to Plaintiff and the other members of the Class for the misstatements and omissions.

96. None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

97. By reason of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

98. Plaintiff acquired TCPI common stock traceable to the IPO.

99. Plaintiff and the other members of the Class have sustained damages. The value of TCPI stock has declined substantially subsequent to and due to Defendants' violations.

100. At the time of their purchases of TCPI stock, Plaintiff and the other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein. Less than one year has elapsed from the time Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time Plaintiff commenced this action. Less than three years has elapsed between the time the shares upon which this Count is brought were offered to the public and the time Plaintiff commenced this action.

## COUNT II

## FOR VIOLATION OF SECTION 12(a)(2) OF THE SECURITIES ACT AGAINST ALL DEFENDANTS

101. Plaintiff repeats and realleges the allegations set forth in ¶¶1-91 above as though fully set forth herein. This claim is asserted against all Defendants.

102. This Count is brought pursuant to Section 12(a)(2) of the Securities Act against all Defendants.

103. Defendants were sellers, offerors, and/or solicitors of purchasers of the common stock offered pursuant to the Prospectus. Defendants issued, caused to be issued, and/or signed the Registration Statement. The Registration Statement contained a Prospectus that was used to induce investors, such as Plaintiff and the other members of the Class, to purchase TCPI common stock.

104. The Prospectus contained untrue statements of material facts, omitted to state other facts necessary to make the statements not misleading, and concealed and failed to disclose material facts. The Individual Defendants' actions of solicitation included participating in the preparation of the false and misleading Prospectus. The Company, acting through its employees, agents, and others, solicited such purchases for its personal financial gain through the preparation and dissemination of the Prospectus.

105. The Company, its employees and agents, and the Individual Defendants owed Plaintiff and the other members of the Class a duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading. Defendants knew, or in the exercise of reasonable care by their employees and agents should have known, of the misstatements and omissions contained in the IPO materials, including the Prospectus, as set forth above.

106. Plaintiff and the other members of the Class purchased or otherwise acquired TCPI common stock pursuant to and/or traceable to the defective Prospectus. Plaintiff did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Prospectus.

107. By reason of the conduct alleged herein, these Defendants violated, and/or controlled a person who violated, Section 12(a)(2) of the Securities Act. Accordingly, Plaintiff and the other members of the Class who hold TCPI common stock purchased in the IPO have the right to rescind and recover the consideration paid for their TCPI common stock and hereby elect to rescind and tender their TCPI common stock to Defendants named herein in return for the consideration paid for those securities together with interest thereon. Plaintiff and the other members of the Class who have sold their TCPI common stock are entitled to rescissory damages.

## COUNT III

### FOR VIOLATION OF SECTION 15 OF THE SECURITIES ACT AGAINST THE COMPANY AND THE INDIVIDUAL DEFENDANTS

108. Plaintiff repeats and realleges the allegations set forth in ¶¶1-91 above as though fully set forth herein. This claim is asserted against TCPI and the Individual Defendants.

109. This Count is brought pursuant to Section 15 of the Securities Act against the Company and the Individual Defendants.

110. The Individual Defendants each were control persons of TCPI by virtue of their positions as directors and/or senior officers of TCPI. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of TCPI. The Company controlled the Individual Defendants and all of TCPI's employees.

111. The Individual Defendants each were culpable participants in the violations of Section 11 of the Securities Act alleged in the Count above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

## IX. EXCHANGE ACT CLAIMS

112. The claims in Counts IV and V below are brought under Sections 10(b) and/or 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5, against Defendants TCPI, Yan, and Catlett for making materially false and misleading statements during the Class Period with actual knowledge or reckless disregard for the truth of their statements, including the false and misleading statements in the Offering Materials identified in paragraphs 73-83 above.

### A. Defendants' False and Misleading Statements

113. In addition to the Defendants' false and misleading statements made in the Registration Statement (*see* ¶¶73-83), the Defendants made the following false and misleading statements and omissions of material facts during the Class Period.

114. As discussed above, Defendants misrepresented and concealed the material facts that the Company failed to adhere to its established policies and procedures regarding its quality control measures.

#### 1. The Second Quarter 2014 Financial Results

115. On August 7, 2014, the Company issued a press release reporting its "Second Quarter 2014 Financial Results," which was also filed with the SEC as an exhibit to a Form 8-K, filed with

the SEC on August 7, 2014. The press release described TCPI as "a leading global manufacturer and distributor of energy efficient lighting technologies."[38]

116. On that same day, following the issuance of the press release, TCPI held a conference call with analysts and investors to discuss the Company's earnings release and operations where it reiterated the Company's successes to date. At that time, Defendant Yan falsely indicated the following:

> ***Our products have received numerous awards and we have established the largest combined number of Energy Star compliant lighting products for LEDs and CFLs.*** Our reputation for ***high quality products*** has allowed us to establish deep relationship with our key customers, including the Home Depot, Wal-Mart, H.D. Supply, Regency and Rexel.[39]

117. The Company filed its Form 10-Q Quarterly Report Pursuant to Section 13 or 15(d) of the Exchange Act on August 8, 2014 for the quarterly period ended June 30, 2014 ("August 8, 2014 10-Q").[40] In it, the Company falsely stated, "We design, develop, manufacture and deliver ***high quality energy efficient lamps, fixtures and internet-based lighting control solutions***" (*id*. at 12), and "***[w]e have established the largest number of Energy Star® compliant lighting products for LEDs and CFLs combined***" (*id*.).

118. The Company also falsely stated that "***disclosure controls and procedures as of June 30, 2014 were effective***" and that "***[t]here have not been any changes in the Company's internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act of 1934) that occurred during the quarter ended June 30, 2014 that had materially***

[38] TCPI's Form 8-K, Ex. 99.1, http://www.sec.gov/Archives/edgar/data/1545391/000119312514300723/d771044dex991.htm.

[39] August 7, 2014 Earnings Call Transcript, at 3.

[40] TCPI's August 8, 2014, 10-Q, http://www.sec.gov/Archives/edgar/data/1545391/000119312514302839/d732581d10q.htm.

***affected, or were reasonably likely to materially affect, the Company's internal control over financial reporting.***" *Id*. at 21.

### 2. The Third Quarter 2014 Financial Results

119. The Company filed its Form 10-Q Quarterly Report Pursuant to Section 13 or 15(d) of the Exchange Act on November 7, 2014 for the quarterly period ended September 30, 2014 ("November 7, 2014 10-Q").[41] In it, the Company falsely stated, "We design, develop, manufacture and deliver ***high quality energy efficient lamps, fixtures and internet-based lighting control solutions***" (*id*. at 12), and "***[w]e have established the largest number of Energy Star® compliant lighting products for LEDs and CFLs combined***" (*id*.).

120. As it did in the August 8, 2014 10-Q, the Company's November 7, 2014 10-Q also falsely certified that its disclosure controls were effective and that there had been no changes to its internal controls over financial reporting. *Id*. at 23.

121. For the reasons stated above in the Substantive Allegations section, and as further detailed herein, Defendants' statements made in the Company's earnings releases dated August 7-8, 2014 and November 7, 2014, and the earnings conference calls held the same day, all of which touted "***high quality energy efficient***" products were materially false and misleading when made or omitted material facts to make such statements not false and misleading, because: (a) the Company was manufacturing lighting fixtures and labeling those products with UL and Energy Star® approval when no such approvals had been received; (b) as would later be revealed, Defendant Yan was circumventing corporate policies that impacted the manufacturing and quality control processes of these products which undermined the Company's standards and practices, such as "[b]ypassing regulatory (UL, CE, EnergyStar etc.) and supplier certification processes," and "[o]verriding and/or

[41] TCPI's November 7, 2014, 10-Q, http://www.sec.gov/Archives/edgar/data/1545391/000119312514302839/d732581d10q.htm.

disregarding Company policies on matters such as . . . product design and safety certification;" (c) as the Company would ultimately admit in its 2014 10-K, Defendant Yan's "actions were inconsistent with setting an appropriate tone at the top by failing to adhere to the Company's established policies and procedures"; (d) Defendant Yan's improper "tone at the top" predated both the IPO and the *Hauser* Action, as was memorialized in the police report filed by Hauser following an acrimonious meeting with Defendant Yan regarding his misconduct, which details Defendant Yan's "explosive" temper; and (e) there were material weaknesses in its internal controls.

**B. The Truth Emerges**

122. On February 27, 2015, the Company issued a press release reporting that claims were filed in Cuyahoga County, Ohio against the Company and Defendant Yan, alleging misconduct by the CEO and related matters. The Company filed the press release with SEC as an exhibit to the March 3, 2015 8-K.

123. The Company issued another press release a few days later in connection with the lawsuit filed by its General Counsel, on March 2, 2015, which revealed:

> TCP takes these allegations seriously. The Audit Committee of TCP's Board of Directors, which is comprised solely of independent directors, is investigating these claims with the assistance of outside legal counsel. The Audit Committee's investigation is ongoing. TCP believes that the one claim against TCP is without merit, and TCP intends to vigorously defend against it. TCP does not intend to comment on the specific allegations and claims made against Ellis Yan.
>
> TCP's senior leadership and more than 7,000 employees worldwide remain focused on continuing the Company's long and successful track record of providing quality products and superior customer service. For over two decades, TCP has been a leader in energy efficient lighting technology, and the TCP team intends to maintain this record well into the future.
>
> Consistent with TCP's commitment to high quality products, the Company has voluntarily chosen to conduct additional levels of quality control on its products. TCP believes this is appropriate and is doing so out of an abundance of caution, and TCP has engaged an outside testing firm to support these efforts. While products are available for shipping, the Company expects some deliveries may be delayed for a

> short time period, and TCP will work closely with customers to minimize any potential impact on orders.
>
> TCP and its management team remain focused on delivering high quality products and customer service, and TCP's Board of Directors is committed to serving the best interests of TCP and its shareholders.

**C. Post-Class Period Allegations**

124. On April 15, 2015, the Company issued two press releases – one announcing the Company's fourth quarter 2014 financial results and another announcing a "Leadership Transition." The Company filed the press releases with SEC as an exhibit to a Form 8-K on that same day. The press release announcing the Leadership Transition stated, among other things:

> Ellis Yan has decided not to renew his employment agreement as Chief Executive Officer as of the expiration of his contract on June 30, 2015. To help ensure a smooth transition, Mr. Yan will continue to serve as Chairman of the TCP Board of Directors and has agreed to be available, as requested, to consult with the new Chief Executive Officer following that appointment.

125. On April 16, 2015, following the issuance of the press release, TCPI held a conference call with analysts and investors to discuss the Company's earnings release and operations, including the Company's announcement in February that it would be conducting a review of its products that carry the UL rating. On that call, Defendant Yan stated:

> We take seriously the quality of our products. In February, we voluntarily choose to conduct additional level of the review on our products that carry UL mark. As a result of these additional steps, we delayed the shipments of some products until validation was complete. And the UL certification were verified. Thanks to the diligent effort over the last several weeks, we have completed work on substantially all of our most popular SKUs.
>
> For the remaining products, we expect to complete validation shortly. With the thousands of the LED and CFL products to review, it has been a long process. However, based on the results of our investigation, we can affirm that UL certified designs are available for all products and that products being shipped are UL certified.

126. In the question and answer segment that followed, analysts sought clarity with regard to the review. For example, one analyst asked:

> ***Jeffrey Osborne, Analyst, Cowen & Company***
>
> So the review is the products you're shipping today, but not the allegations of past products that have been shipped. I just want to understand the process here going through internally of the review of the thousands of SKUs that you talked about. Are you going back and looking at historical shipments or just shipments today?
>
> ***Brian Catlett, TCPI CFO and Treasurer***
>
> The review that we are doing is to take a look at the products that we had in our inventory as well as the products that we are shipping. We cannot comment specifically on the allegations in the litigation since it's an ongoing matter.
>
> ***Jeffrey Osborne***
>
> Okay. I just had two more. One is, can you give us a sense of you mentioned that the – or Q1 revenue was down year-on-year. About what percentage of a typical quarter's revenue is associated with UL certified products that could potentially be in the delayed bucket? Is it half your products, 60%, 70%, 80%, all of your products? I'm just trying to get a sense of what percentage of your SKUs were related to this delay.
>
> ***Brian Catlett***
>
> Approximately 75%.

127. That same day, the Company issued its 2014 10-K. Therein, in addition to reiterating its annual financial results, the Company announced, for the first time:

> We have identified a material weakness in our internal control over financial reporting which could, if not remediated, result in material misstatements in our financial statements.
>
> * * *
>
> We have begun to implement a plan to take measures to remediate the underlying causes of the material weakness, primarily through changes to the overall design of our internal control environment including the resignation of our Chief Executive Officer on June 30, 2015, and a review and reorganization of our organizational structure and the roles and responsibilities within each functional group.

*Id.* at 21-22.

### D. Loss Causation

128. As detailed throughout and further herein, Defendants' fraudulent scheme artificially inflated TCPI's stock price by misrepresenting and concealing that the Company was circumventing

its alleged commitment to quality control procedures and testing by manufacturing and selling products that were improperly designated UL approved and/or ENERGY STAR® certified.

129. While each of Defendants' misrepresentations and omissions was independently fraudulent, they all were motivated by Defendants' desire to artificially inflate TCPI's stock price and the image of its future business prospects to give the market the false appearance that TCPI was selling high-quality energy efficient products. These false and misleading statements and omissions, among others, had the intended effect of preventing the market from learning the full truth and keeping the Company's stock price artificially inflated throughout the Class Period. Indeed, Defendants' false and misleading statements and omissions had the intended effect and caused, or were a substantial contributing cause of, TCPI stock trading at artificially inflated levels, reaching as high as $11.40 during the Class Period.

130. The true picture about TCPI's faulty internal controls emerged after the markets closed on February 26, 2015 and continued through March 2, 2015, when it was reported that charges had been filed against the Company and Defendant Yan by TCPI's then General Counsel, and that, as a result of these claims, the Company would be conducting additional levels of quality control on its products.

131. When the foregoing revelations were made on February 27, 2015 and March 2, 2015, it was an indication to the market that Defendants' prior Class Period statements were false and misleading. As a result, the price of TCPI's stock immediately dropped ***nearly 57%*** following these announcements, on abnormally high trading volume, as the market reacted to revelations in the Company's various announcements.

132. The rapid decline in TCPI's stock price was the direct result of the nature and extent of the revelations made to investors and the market regarding the Company's quality control

procedures and practices, which had been concealed or misrepresented by Defendants' scheme and misstatements. Thus, the revelations of truth, as well as the resulting clear market reaction, support a reasonable inference that the market understood that Defendants' prior statements were false and misleading. In sum, as the truth about Defendants' prior misrepresentations and concealments was revealed, the Company's stock price quickly declined, the artificial inflation was removed from the stock price, and Plaintiff and members of the Class were damaged.

133. The timing and magnitude of TCPI's stock price declines during the Class Period negates any inference that the losses suffered by Plaintiff were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct. This point is evidenced by the chart below, which demonstrates the clear divergence of TCPI's stock price from its identified comparable indices[42] as the revelation of the truth became known to the market:

[42] TCPI's 2014 10-K identifies the NASDAQ Composite Index and NASDAQ Clean Edge Green Energy Index as a benchmark for its common stock performance. *See id.* at 32.




134. The economic loss, *i.e.*, damages, suffered by Plaintiff was a direct and proximate result of Defendants' scheme and misrepresentations and omissions that artificially inflated TCPI's stock price and the subsequent significant decline in the value of TCPI stock when the truth concerning Defendants' prior misrepresentations and fraudulent conduct entered the marketplace.

**E. Additional Allegations of Scienter**

135. The Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading, and knowingly or recklessly substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws.

136. The Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding TCPI, its operations, and its business practices, their control over and/or receipt of

TCPI's materially misleading misstatements and/or their associations with the Company that made them privy to confidential proprietary information concerning, among other things, TCPI's quality control policies and procedures, were active and culpable participants in the fraudulent scheme alleged herein. The Individual Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information, which they caused to be disseminated to the investing public. The ongoing fraud as described herein could not have been perpetrated without the knowledge and/or recklessness and complicity of personnel at the highest level of the Company, including the Individual Defendants.

137. Moreover, the information pled in the *Hauser* Action and identified by the Audit Committee is directly from and about Defendant Yan himself. These allegations, in and of themselves, convincingly demonstrate scienter.

138. Defendants Yan and Catlett also undertook the affirmative obligation to obtain knowledge to ensure the Company's disclosures to the market were truthful when they executed certifications pursuant to the Sarbanes-Oxley Act of 2002. The certifications stated that Defendants Yan and Catlett reviewed the Company's 2014 10-K and Forms 10-Q throughout the Class Period and that they did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by" that report.

139. During the Class Period, the Individual Defendants were high-ranking officers (*i.e.*, CEO and CFO) who were intimately involved with, and had day-to-day responsibilities concerning, the Company's quality control policies and procedures. Accordingly, through their receipt of internal reports and their involvement with the daily operations of TCPI, the Individual Defendants were intimately aware of the true nature of their quality control policies and procedures and

repeatedly touted its high quality energy efficient products. As a result, as TCPI's most senior executives, the Individual Defendants knew, or, at a minimum were severely reckless in not knowing, about its quality control policies and procedures.

140. These facts, in conjunction with the additional indicia of scienter detailed above in the Substantive Allegations section, collectively support a strong inference of each Individual Defendants' scienter.

**F. Presumption of Reliance**

141. Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein are primarily predicated upon omissions of material fact which there was a duty to disclose. Specifically, Plaintiff is entitled to a presumption of reliance throughout the Class Period because, as more fully alleged above, Defendants failed to disclose material information regarding, *inter alia*, its quality control policies and procedures.

142. Plaintiff is also entitled to a presumption of reliance under the fraud-on-the-market doctrine for Defendants' material misrepresentations, because the market for TCPI's publicly traded common stock was open, well-developed, and efficient at all times. As a result of these materially false and misleading statements, TCPI's publicly traded common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired TCPI's publicly traded common stock relying upon the integrity of the market price of those securities and the market information relating to TCPI, and have been damaged thereby.

143. At all relevant times, the market for TCPI's securities was an efficient market for the following reasons, among others:

(a) TCPI stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) as a regulated issuer, TCPI regularly made public filings with the SEC, including its 2014 10-K, Forms 10-Q, and related press releases;

(c) TCPI regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, and other similar reporting services; and

(d) TCPI was followed by several securities analysts employed by major brokerage firms, such as Cowen, Piper Jaffray, and Canaccord, among others, who wrote research reports that were distributed to the brokerage firms' sales force and the public at large. Each of these reports was publicly available and entered the public marketplace.

144. As a result of the foregoing, the market for TCPI common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of TCPI common stock.

145. Under these circumstances, all purchasers of TCPI's publicly traded common stock during the Class Period suffered similar injury through their purchase of such at artificially inflated prices and a presumption of reliance applies.

146. At the times they purchased or otherwise acquired TCPI's publicly traded common stock, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not reasonably have discovered those facts. As a result, the presumption of reliance applies.

147. In sum, Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a) Defendants made public misrepresentations during the Class Period;

(b) the misrepresentations were material;

(c) the Company's common stock traded in an efficient market;

(d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's publicly traded common stock; and

(e) Plaintiff and the other members of the Class purchased the Company's securities between the time Defendants misrepresented material facts and the time the true facts were disclosed, without knowledge that such facts were misrepresented.

**G. No Safe Harbor**

148. The federal statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the allegedly false and misleading statements pled in this Complaint. Many of the specific statements pled herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

149. Indeed, the risk warnings that were provided by Defendants in their Class Period statements (and before), include boilerplate statements, such as:

- We occasionally experience component quality problems with suppliers, and our current suppliers may not deliver satisfactory components in the future.

August 8, 2014 10-Q at 25.

- Certification and compliance are important to adoption of our lighting products, and failure to obtain such certification or compliance may have an adverse effect on our business, financial condition and results of operations.

*Id.*

150. These very, or materially identical, risks were disseminated well before the Class Period and did not serve to adequately inform the market of the true risks and actual operational

experience of the Company. Indeed, that these stated warnings were inadequate and provided no new, meaningful information, may be seen from the market's reaction to the revelation of Defendants' prior untrue and/or misleading statements.

151. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pled herein, Defendants are liable for those false and misleading forward-looking statements because, at the time each of those forward-looking statements were made, as detailed above in the Substantive Allegations section, the particular speaker had actual knowledge that the particular forward-looking statement was false or misleading and/or the forward-looking statement was authorized and/or approved by an executive officer of TCPI who had actual knowledge that those statements were false or misleading when made. Moreover, to the extent that Defendants issued any disclosures designed to "warn" or "caution" investors of certain "risks," those disclosures were also false and misleading since they did not disclose that Defendants were actually engaging in the very actions about which they purportedly warned and/or had actual knowledge of material adverse facts undermining such disclosures.

## COUNT IV

## FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST THE COMPANY AND INDIVIDUAL DEFENDANTS

152. Plaintiff repeats and realleges the allegations set forth in ¶¶1-4, 6-15, 22-70, 112-229 above as though fully set forth herein. This claim is asserted against TCPI and the Individual Defendants.

153. During the Class Period, TCPI and the Individual Defendants, and each of them, carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public, Plaintiff, and the other Class members, as alleged herein; (b) artificially inflate and maintain the market price of TCPI's publicly traded common stock;

and (c) cause Plaintiff and the other members of the Class to purchase TCPI's publicly traded common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, TCPI and the Individual Defendants, and each of them, took the actions set forth herein.

154. TCPI and the Individual Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Company's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. TCPI and the Individual Defendants are sued as primary participants in the wrongful and illegal conduct charged herein. The Individual Defendants are also sued as controlling persons of TCPI, as alleged below.

155. In addition to the duties of full disclosure imposed on TCPI and the Individual Defendants as a result of their making affirmative statements and reports, or participating in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. §210.01, *et seq*.) and S-K (17 C.F.R. §229.10, *et seq*.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, sales, product marketing and promotion, financial condition, and operational performance so that the market price of the Company's publicly traded common stock would be based on truthful, complete, and accurate information.

156. TCPI and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information.

157. TCPI and the Individual Defendants each employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of TCPI's value, performance, and continued substantial sales and financial growth, which included, among other things, the making of, or the participation in the making of, untrue statements of material facts about the Company's quality control policies and procedures and omitting to state material facts necessary to make the statements made about revenue not misleading in light of the circumstances under which they were made, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of TCPI common stock during the Class Period.

158. The Individual Defendants' primary liability arises from the following facts, among others: (a) the Individual Defendants were high-level executives at the Company during the Class Period; (b) the Individual Defendants, by virtue of their responsibilities and activities as senior executive officers, were privy to, and participated in, the creation, development, and reporting of the Company's sales, marketing, projections, and/or reports; (c) the Individual Defendants enjoyed significant personal contact and familiarity with, were advised of, and had access to other members of the Company's management team, internal reports, and other data and information about the Company's quality control policies and procedures at all relevant times; and (d) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

159. TCPI and the Individual Defendants, and each of them, had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with severely reckless disregard for the truth, in that each failed to ascertain and disclose such facts, even though such facts were available to each of them. TCPI and the Individual Defendants' material misrepresentations and/or omissions were made knowingly or with deliberate recklessness and for the purpose and effect of concealing adverse information regarding the Company from the investing public and supporting the artificially inflated price of its securities. As demonstrated by the Individual Defendants' misstatements and omissions throughout the Class Period, the Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

160. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of TCPI common stock was artificially inflated during the Class Period. In ignorance of the fact that the market price of TCPI's publicly traded common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by TCPI and the Individual Defendants, or upon the integrity of the market in which the stock traded, and/or on the absence of material adverse information that was known to, or disregarded with deliberate recklessness by, TCPI and the Individual Defendants but not disclosed in public statements by TCPI and the Individual Defendants during the Class Period, Plaintiff and the other members of the Class acquired TCPI's publicly traded common stock during the Class Period at artificially high prices and were damaged thereby, as evidenced by, among others, the stock price declines referenced above.

161. At the time of said misrepresentations and omissions, Plaintiff and the other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known of the true nature and prospects of TCPI's revenue figures, which were not disclosed by TCPI and the Individual Defendants, Plaintiff and the other members of the Class would not have purchased or otherwise acquired their TCPI publicly traded common stock during the Class Period; or, if they had purchased or otherwise acquired such during the Class Period, they would not have done so at the artificially inflated prices which they paid.

162. By virtue of the foregoing, TCPI and the Individual Defendants have each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

163. As a direct and proximate result of TCPI and the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's publicly traded common stock during the Class Period, as evidenced by the stock price declines discussed above, when the artificial inflation was removed from the price of TCPI's stock.

## COUNT V

### FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS

164. Plaintiff repeats and realleges the allegations set forth above in ¶¶1-4, 6-15, 22-70, 112-229 above as though fully set forth herein. This claim is asserted against the Individual Defendants.

165. The Individual Defendants acted as controlling persons of TCPI within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions with the Company, participation in, and/or awareness of, the Company's operations, and/or intimate knowledge of the Company's fraudulent practices and the Company's actual results and future

prospects, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

166. In addition, the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein and exercised the same.

167. As set forth above, TCPI and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their controlling positions, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's publicly traded common stock during the Class Period, as evidenced by the stock price declines discussed above, when the artificial inflation was removed from the price of TCPI stock.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on its own behalf and on behalf of the Class, pray for relief and judgment, as follows:

A. Declaring that this action is a proper class action and certifying Plaintiff as Class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Class Counsel for the proposed Class;

B. Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D. Such other and further relief as the Court deems appropriate.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

DATED: October 28, 2015

ROBBINS GELLER RUDMAN
& DOWD LLP

s/ JACK REISE

JACK REISE (*pro hac vice*)
SABRINA E. TIRABASSI (*pro hac vice*)
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3064 (fax)
jreise@rgrdlaw.com
stirabassi@rgrdlaw.com

*Lead Counsel for Plaintiff*

LANDSKRONER • GRIECO • MERRIMAN, LLC
JACK LANDSKRONER (Ohio Bar # 0059227)
1360 West 9th Street, Suite 200
Cleveland, OH 44113
Telephone: 216/522-9000
216/522-9007 (fax)
jack@lgmlegal.com

*Liaison Counsel*

VANOVERBEKE MICHAUD & TIMMONY, P.C.
THOMAS C. MICHAUD (*pro hac vice*)
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

*Additional Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 28, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.

s/ JACK REISE